APPEALS OF JULIA ANDREWS BRUCE AND EDITH ANDREWS LOGAN, EXECUTRIX, ESTATE OF LOUISA ANDREWS.

Docket Nos. 4447, 5461.     Decided October 30, 1926.

Taxpayer sold stock on March 11, 1916, for more than cost and less than the March 1, 1913 value. A part of the consideration received was a contract providing for future payments as ore was mined. The contents and life of the mine and the annual production were capable of determination. *Held*, that the transaction in 1916 was a completed sale resulting in no taxable gain or loss, and the payments made under the contract in the taxable year were in part a return of capital, that is, the present worth of the future payments as of the time of the receipt of the contract, and a portion was gain.

*John W. Ford, Esq., Walter M. Anderson, Esq.*, and *George Oliver May, C. P. A.*, for the petitioners.
*L. C. Mitchell, Esq.*, for the Commissioner.

These are appeals from the determination of deficiencies in income tax, in the amount of $6,138.95 for 1920 in the case of Julia Andrews Bruce, and in the amount of $9,210.88 for 1918 in the case of the estate of Louisa Andrews. The deficiencies arose out of the sale of certain stock on March 11, 1916, where part of the consideration was paid in cash and part in deferred payments.

FINDINGS OF FACT.

Julia Andrews Bruce, is a resident of Greenwich, Conn. Edith Andrews Logan is the duly appointed, qualified and sole surviving

executrix of the estate of Louisa Andrews, and is a resident of Youngstown, Ohio.

Prior to March 1, 1913, and continuously to March 11, 1916, the Andrews & Hitchcock Iron Co., an Ohio corporation, had outstanding 4,000 shares of capital stock, of which the petitioner Julia Andrews Bruce owned 350 shares, and the decedent Louisa Andrews, mother of Julia Andrews Bruce, owned 1,180 shares. That corporation owned 12 per cent of the capital stock of the Mahoning Ore & Steel Co., a Pennsylvania corporation, and, by virtue of a contract (referred to as exhibit A in the contract, excerpts from which are herewith quoted), was entitled to 12 per cent of the ores mined by that company. On March 11, 1916, all of the stockholders of the Andrews & Hitchcock Iron Co., including Julia Andrews Bruce and Louisa Andrews, entered into a written contract with the Youngstown Sheet & Tube Co., a corporation of Ohio, providing for the sale of their stock in the Andrews & Hitchcock Iron Co. to the Youngstown Sheet & Tube Co., according to the terms of such contract, the pertinent parts of which are as follows:

First. The stockholders, for themselves and their respective heirs, representatives and assigns, agree with The Youngstown Company, for itself, its successors and assigns, that they will sell, assign, transfer and set over to The Youngstown Company, and the others hereinafter designated, all of said capital stock of said The Andrews & Hitchcock Iron Company, and The Youngstown Company agrees that it will purchase said stock, for itself and said others, hereinafter designated, and pay therefor to THE DOLLAR SAVINGS & TRUST COMPANY of Youngstown, Ohio, for the benefit of said stockholders, the sum of ONE THOUSAND DOLLARS ($1,000.00) cash in hand upon the execution and delivery of this agreement, receipt whereof is hereby acknowledged; the further sum of TWO MILLION ONE HUNDRED NINETY-NINE THOUSAND DOLLARS ($2,199,-000.00) on the 11th day of April, A. D. 1916, and the further sum in amount and manner to be determined as provided in paragraph 4 hereof.

Second. Said stockholders further agree that forthwith upon the execution and delivery of this contract, they will deliver, or cause to be delivered to said The Dollar Savings & Trust Company all of said capital stock properly assigned, and that they will cause said The Dollar Savings & Trust Company to deliver the same to said The Youngstown Company and others upon the payment of said sum of TWO MILLION ONE HUNDRED NINETY-NINE THOUSAND DOLLARS ($2,199,000.00) to said The Dollar Savings & Trust Company on said 11th day of April, as above provided, it being the intention of the parties that the title to said stock shall pass to and rest in The Youngstown Company, and said others, upon the making of said payment on April 11th, 1916, and that delivery of said stock and the making of said payment shall be simultaneous.

\*      \*      \*      \*      \*      \*      \*

Fourth. It is understood that said THE ANDREW & HITCHCOCK IRON COMPANY is the owner of twelve percent of three hundred sixty (360) shares of the capital stock of the MAHONING ORE & STEEL COMPANY, a corporation of the State of Pennsylvania, having a capital stock of THREE HUNDRED THOUSAND DOLLARS ($300,000.00)) divided into Three Thousand (3,000) shares of the par value of One Hundred Dollars ($100.00) each, which said ORE & STEEL COMPANY is the

owner of certain valuable mines for the production of iron ore, and that the said THE ANDREWS & HITCHCOCK IRON COMPANY, by an agreement in writing in quintuplicate being date of December 16, 1914, is entitled to take each year, a full quota of each grade of ore to be produced by said Ore & Steel Company in proportion to the amount of stock owned by or represented for it, as provided for in said agreement, a copy of which is hereto attached, and marked "Exhibit A" for the purpose of making the same a part hereof; and for the purpose of fixing the balance of the purchase price to be paid by The Youngstown Company. * * *

It was further agreed between the parties as follows:

That the Youngstown Company shall, and will each year hereafter, take or cause to be taken the full quota of ore to which the said THE ANDREWS & HITCHCOCK IRON COMPANY, its successors or assigns, may be entitled, under and by virtue of the terms of said written agreement of December 16, 1914, and shall give the notice provided for in said agreement, and will pay or cause to be paid to said THE DOLLAR SAVINGS & TRUST COMPANY for the benefit of said stockholders, and as the balance of said purchase price, each year, on or before thirty days after the close of navigation of the transportation of ore on the Great Lakes, the sum of Sixty Cents (60c) per ton for each and every ton of twenty-two hundred forty (2240) pounds of iron ore so entitled to be taken for such year, and actually delivered by said Ore & Steel Company, it being understood that if any part of the quota for any year be left at the mine by election of The Youngstown Company, The Youngstown Company shall pay on account thereof to the stockholders in the same manner as though the same had been shipped from the mine, but shall not thereafter be required to pay any additional sum on account thereof.

Fifth: In order to secure the making of said deferred payment of said purchase price, as provided for in Paragraph Fourth, it is further agreed between the parties that said three hundred sixty (360) shares of said Ore & Steel Company stock shall be properly assigned and deposited in the hands of said The Dollar Savings & Trust Company as collateral security therefor, and shall be so held until all of the balance of said purchase price is fully determined and paid. If at any time The Youngstown Company fails to pay punctually any installment of said purchase price as it falls due, and such default continues for the period of thirty days after written notice and demand therefor made by the stockholders, or any of them, then any of said stockholders, in addition to any other lawful remedy, may elect to take and keep as and for his own, his proportionate share of said Ore & Steel Company stock to which his pro rata holdings of stock of said The Andrews & Hitchcock Iron Company, as herein set forth, may entitle him. and shall have the further additional right to recover any and all costs, expenses, damages and attorney fees suffered or incurred by him in the premises. * * *

The pertinent part of "Exhibit A," above referred to, is as follows:

The tonnage of each grade to be produced annually shall be fixed by the Board of Directors on or before April 1st, in each year, and notice of the fixing of said tonnage shall be mailed promptly to each stockholder.

Each of the interests, as hereinbefore set forth, shall be entitled to take a full quota of each grade to be produced, in proportion to the amount of stock owned by or represented for them, and within fifteen days after receipt of notice referred to in preceding paragraph, shall notify in writing the President of said Mahoning Ore & Steel Company, whether or not it elects to take

the full quota to which it is entitled. Undesired tonnage, if any, shall be offered *pro rata* to the other stockholders, and such portion thereof not desired by them can be disposed of by the Board of Directors by reducing the originally fixed production to the extent of the unaccepted tonnage or in any other manner the Board of Directors may agree upon.

The price of ores shall be fixed each year by the Board of Directors and shall be at or about the cost of production, including all costs, transportation, delivery, handling, etc., to the lower lake ports. * * *

Louisa Andrews died on the 22nd day of March, 1917, and Julia Andrews Bruce received by will a one-half interest in the residuary estate of Louisa Andrews. Prior to her death, but subsequent to March 11, 1916, Louisa Andrews gave to John Shaw an 80/4000 interest in the sale price under said contract of March 11, 1916, unpaid at the time of said gift and there was contained in the residuary estate of Louisa Andrews an 1100/4000 interest in said sale price under said contract of March 11, 1916, unpaid at the time of her death.

The value as of March 1, 1913, of 350 shares of capital stock of the Andrews & Hitchcock Iron Co., then owned by Julia Andrews Bruce, can not be determined by the evidence, but it was stipulated that such value was in excess of $274,093.33. Julia Andrews Bruce, with respect to her ownership of 350 shares of said stock, received as her share of the cash consideration of $2,200,000 paid under said contract of March 11, 1916, the sum of $192,500. In addition thereto, she received in respect of the sale price of said 350 shares, and further in respect of the 550/4000 interest in the unpaid sale price under said contract of March 11, 1916, which she received from her mother's estate, the following sums of money in the aggregate: in the year 1917, $13,860; 1918, $15,750; 1919, $32,383; 1920, $19,599.53. Of the sums so received by her, the part thereof attributable to the 550/4000 interest in said unpaid sale price inherited from her mother, Louisa Andrews, was less than the value fixed by the Commissioner upon said interest, for the purposes of Federal estate tax imposed upon the estate of Louisa Andrews, namely, $277,164.50.

The value as of March 1, 1913, of 1,100 shares of the capital stock of the Andrews & Hitchcock Iron Co., then owned by Louisa Andrews, can not be determined from the evidence, but it was stipulated that it was in excess of the $698,060, and that Louisa Andrews, with respect to her ownership of the said 1,100 shares of stock, received as her share of the cash consideration of $2,200,000 paid under said contract of March 11, 1916, the sum of $605,000; in addition thereto, Louisa Andrews and her estate received, in respect of the sale price of said 1,100 shares, the following sums in the aggregate: in 1917, $43,560; in 1918, $49,500. The amount so received by the estate of Louisa Andrews for the taxable year, namely, $49,500, was less than the value fixed by the Commissioner for the purpose of

Federal estate tax upon the 1100/4000 interest of Louisa Andrews in the unpaid sale price under said contract of March 11, 1916, namely, $554,329.

Louisa Andrews and her estate, between March 1, 1913, and December 31, 1918, and Julia Andrews Bruce, between March 1, 1913, and December 31, 1920, kept no books, and their returns for Federal income taxation purposes for the years 1916 to 1918, inclusive, in the Louisa Andrews estate, and for the years 1916 to 1920, inclusive, in the Julia Andrews Bruce case, were made upon the basis of cash receipts and disbursements.

At the date of the contract, March 11, 1916, the estimated ore reserves of the Mahoning Ore & Steel Co. were 82,858,535 tons. The Commissioner, in fixing the deficiencies in these appeals, has determined that the estimated annual production at that time was 1,841,300 tons. The determination of the Commissioner as to annual production and life of the mine was based upon opinions of engineers qualified by education and training in the mining industry to give such opinions. The actual production for three years prior to March 11, 1916, was in accordance with the Commissioner's finding as to the estimated future production. At the rate of 60 cents per ton, the amount to be received in the future, under the provisions of the contract of March 11, 1916, was upon the basis of ore reserves of 82,858,535 tons—at that date $5,965,814.52. The present worth of this amount, at March 11, 1916, discounted at 6 per cent with provision for a sinking fund of 4 per cent, covering a period of 45 years, was $1,942,111.46.

The petitioners' returns were made upon the theory that there was no taxable income received by virtue of the payments made under the contract of March 11, 1916, until the March 1, 1913, value, or the value at the time of the death of the decedent, of the stock sold had been returned. The Commissioner did not accept this theory of the transaction and determined that income was received each year as payments were made for ore mined during the respective years, after attributing a portion of the payments to a return of capital.

OPINION.

TRAMMELL: These appeals grow out of the sale on March 11, 1916, by the stockholders of the entire capital stock of the Andrews & Hitchcock Iron Co. to the Youngstown Sheet & Tube Co. The issues involved are as follows:

(1) What amount, if any, is taxable to the estate of Louisa Andrews in 1918 and to Julia Andrews Bruce in 1920, on account of the deferred payments of the Youngstown Sheet & Tube Co. received by them as vendors of the shares of the Andrews & Hitch-

cock Iron Co. stock under the contract for the sale of that stock made by them along with the other stockholders on March 11, 1916?

(2) What amount, if any, is taxable to Julia Andrews Bruce on account of her interest of 550/4000 in the deferred payments acquired by her by inheritance from her mother, Louisa Andrews, who died on March 22, 1917?

The Commissioner has determined that the total consideration received from the sale on March 11, 1916, consisting of the cash payment and the present worth of the future payments exceeded the cost of the stock prior to March 1, 1913, but was less than the value as of March 1, 1913; that the contract right received by the stockholders had a determinable market value, and that the sale on March 11, 1916, constituted a completed transaction from which no taxable gain or deductible loss resulted; that as a consequence a new basis for determining gain or loss was created; that the amounts received from the contract in excess of the present worth thereof when the right was received in 1916 were taxable gain; and that the amount reserved by Julia Andrews Bruce with respect to the 550 shares of stock inherited by her was taxable to the extent of the excess of the payments received over the value of the right to receive them, or their present worth, when received. It has been stipulated that the estimated ore reserves of the Mahoning Ore & Steel Co. on March 11, 1916, were 82,858,535 tons. It was also stipulated that engineers qualified by training and education to give opinions as to the annual production and life of the mine estimated the future production at 1,841,300 tons annually, and that the life of the mine was 45 years as of March 11, 1916. The total ore payments to be made to the stockholders of the Andrews & Hitchcock Iron Co., under the contract of March 11, 1916, would then be $5,965,814.52. It was further stipulated that the present worth of this amount at the time of the sale, assuming that it would be received in equal annual installments for 45 years, discounted at 6 per cent, with provisions for a sinking fund at 4 per cent was $1,942,111.46. In accordance with these estimates and calculations, the Commissioner determined that the 4,000 shares of Andrews & Hitchcock Iron Co. stock were sold on March 11, 1916, for $2,200,000, cash, and for future payments having a present worth of $1,942,111.46.

Louisa Andrews died on March 22, 1917. She possessed at the time of her death the right to receive ore payments at the rate of 60 cents per ton incident to her former ownership of 1,100 shares of the Andrews & Hitchcock Iron Co. The Commissioner valued this contract right for estate-tax purposes at $554,329 at the time of her death. There is no other evidence as to its value and we therefore accept that valuation. In the year 1918 the estate received as ore payments the total sum of $49,500. Of this total sum the Commis-

sioner determined that $16,383.68 represented a return of capital, that is, the present worth of future payments, and that the pro rata portion of the remainder represented taxable income.

Julia Andrews Bruce inherited a part of the contract right possessed by her mother. During the year 1920 she received a total of $19,599.53 from ore payments. These payments accrued to her by reason of the sale of her stock in 1916 and through her succession to contract rights owned by her mother. The Commissioner determined that of the total amount received $6,445.65 represented return of capital and that the remainder represented taxable income.

The petitioners contend that the Commissioner erred in adding to the taxable income any part of the ore payments received; that the consideration received in 1916, in addition to the cash, possessed no market value; that it was undeterminable by reason of the fact that the tonnage to be produced annually was to be fixed by the board of directors of the Mahoning Ore & Steel Co. on or before April 1 of each year, and that there were no means of determining the annual or total production; that, as a consequence, the sale in 1916 did not result in taxable gain and that the amounts received should not be subjected to tax until the March 1, 1913, value has been returned to the petitioners, and with respect to the 550 shares inherited by Julia Andrews Bruce, until the value thereof at the time of the death of Louisa Andrews has been recovered.

Considering, first, the contention of the petitioners that the consideration for the stock received on March 11, 1916, was not determinable, we find in the stipulation of facts that on that date the estimated ore reserves of the Mahoning Ore & Steel Co. were 82,858,535 tons; that the stockholders of the Andrews & Hitchcock Iron Co. were entitled to receive 60 cents per ton, or 12 per cent of the total tonnage, or 9,943,024 tons. From these facts it follows that the stockholders were to receive total ore payments of $5,965,814.52 during the life of the mine. The controversy, however, arises over the possible annual production and life of the mine. But it was stipulated that the Commissioner's determination of an anticipated annual production of 1,841,300 tons and an anticipated life of 45 years were based upon the opinions of engineers qualified by education and training in the iron mining industry to give such opinions. It is also agreed that for three years prior to March 11, 1916, the actual production was substantially 1,841,300 tons annually.

The Massabe Range, where this mine is located, is one of the outstanding iron producing regions of the world. The annual production of this mine for several years prior to 1912 had been around 1,250,000 tons. During the earlier years of the World War period, and up to 1916, it was approximately 1,870,000 tons. The company, as of March 11, 1916, in the midst of the World War, and with the

greatest demand for steel in its history, was contemplating a production of 3,000,000 tons annually. In 1918, when this country was in the war and the demand for steel was great, the production was 2,500,000 tons, as shown by the payment of $49,500 to the estate of Louisa Andrews, attributable to 1,100 shares. In 1920, when the war was over, the production had dropped to approximately 1,361,000 tons, as shown by the payment of $19,599.50 to Julia Andrews Bruce, attributable to 900 shares. These results indicate that the annual production of 1,841,300 tons was a fair and reasonable estimate and that the life of the mine from 1916 would be approximately 45 years.

While testimony was introduced to the effect that the contents of the mine and the annual production could not be determined in 1916, from a consideration of all the evidence we are disposed to accept the figures of the engineers who, it was stipulated, were qualified to express an opinion with respect thereto.

The petitioners have also raised the point that there was no market value for the contract right received by Julia Andrews Bruce and Louisa Andrews in 1916. The only testimony offered in support of these contentions was by Hitchcock, former president of the Andrews & Hitchcock Iron Co. This witness testified that in the negotiations for the sale of the stock there was no discussion concerning a full cash payment, because the buyer, the Youngstown Sheet & Tube Co., could not afford to pay cash in full. This is all the testimony offered in support of the allegation that the contract to receive future payments had no market value.

The contract of December 16, 1914, between the Mahoning Ore & Steel Co. and its stockholders was unequivocal and applied to the total contents of the steel company's mine, as and when mined. The contract of March 11, 1916, between the Youngstown Sheet & Tube Co. and the former stockholders of the Andrews & Hitchcock Iron Co., assured to the latter deferred payments equivalent to 60 cents per ton on 12 per cent of the total ore reserves of the steel company's mines. The deferred payments were secured by shares of the capital stock of the steel company owned by the Andrews & Hitchcock Iron Co., which had been placed in the hands of a trustee for that purpose, and, under the terms of the contract by virtue of which these shares were deposited with the trustee, the stockholders were assured that, in the event of default in any of the deferred installments by the purchaser of the stock, they would receive their pro rata share of the ore produced by the steel company by exercising their option to take over the collateral securities. It must follow that the contract right was of such nature and the payments therein provided for were so determinable and assured that it had a market value when received. The amounts received in the taxable years were in excess of the value

which the contract had when received. The property, consisting of the contract for future payments received, had a market value.

The transaction of March 11, 1916, was complete within itself. It amounted to what is commonly known and referred to as a " closed transaction.". It was of such a nature that it created a new basis for determining gain or loss with respect to the subsequent payments made under the terms of the contract. In view of this fact the March 1, 1913, value of the assets sold becomes immaterial to the consideration or decision of the case. The Commissioner in his determination of the deficiency has determined the fair market value of the right to receive future payments, and from the evidence presented we can not say that his determination is not correct. A portion of each payment under the contract was a return of capital and a portion represented gain. The Commissioner has determined what portion is gain by dividing the 1916 value of the contract by the total tonnage to be obtained, reaching the conclusion that the payment for each ton represents 19.53 cents return of principal and 40.47 cents income, or, in other words, that each payment, whether made one year after the agreement was made or 45 years thereafter, is made up 35.554 per cent return of principal and 67.446 per cent income.

The payments to all the stockholders were estimated by the Commissioner to be $132,573.60 annually for 45 years. These payments were reduced to present worth, using a discount of 6 per cent on future payments with a 4 per cent return on sinking fund. It is evident that the present worth of the payment to be received at the end of the first year differs substantially from the present worth of the payment to be received 45 years in the future. It is further evident that the present worth of all of the payments is the sum of the present worth of each annual payment, proper adjustment for the sinking fund being made. In determining what portion of the payment represented a return of the 1916 value, the Commissioner has made the allocation between principal and gain as if the present value in 1916 of each of the annual payments to be received was exactly the same. The proper manner in which to determine what portion of the payment is principal is to split up the total 1916 present worth into its component parts and to treat the present value of the first year's payment as a return of principal upon the first 1,841,300 tons (the estimated annual production) mined, the present value of the second year's payment as a return of principal upon the second 1,841,300 tons mined, and similarly each year until the mine becomes exhausted, or the principal is all returned.

With respect to the stock received by Julia Andrews Bruce on the death of Louisa Andrews there is no reason or authority for going back of the date of death for a basis for computing gain or loss. The rights of the taxpayer under the contract had a market value in

1917, when her right thereunder was received, and upon a subsequent sonversion of such contract right, or upon receipt of any gain by virtue thereof, the value thereof at the date of acquisition is to be taken as the basis for computing taxable gain or deductible loss.

*Judgment will be entered on 15 days' notice, under Rule 50.*